**Commonwealth v. DeLuca**

C.P. of Delaware County, nos. 8095-07 and 8101-07.

*Vram Nedurian Jr.,* for Commonwealth.
*Patrick Connors,* for defendant Mario DeLuca.
*Jonathan Consadene,* for defendant Ronald DeLuca.

JENKINS, *J.,* November 13, 2008—On June 22, 2007, a health inspector and police officer discovered marijuana and marijuana residue while executing an administrative warrant at defendants' residence. The officer returned with a search warrant, and defendants were arrested and charged with drug-related offenses.

On April 17, 2008, following an evidentiary hearing, the court denied defendants' motions to suppress all evidence seized during the searches. On July 21, 2008, after a non-jury trial, the court found both defendants guilty of possession of a small amount of marijuana under the Controlled Substance Act. On August 25, 2008, the court sentenced Ronald DeLuca to 15-30 days imprisonment with credit for time served and Mario De-

Luca to probation. Both defendants filed timely appeals and timely statements of matters complained of on appeal (concise statement).[1]

On appeal, Mario DeLuca argues only that the four corners of the administrative warrant for his residence did not provide probable cause for the search. Ronald DeLuca joins in Mario DeLuca's four corners challenge and also raises a series of other objections to the search, including a claim that the administrative warrant was merely a pretext for gaining access to the residence. Ronald DeLuca also attacks the sufficiency of the evidence against him by arguing that (a) the Controlled Substance Act does not criminalize possession of marijuana residue, and (b) he was not in constructive possession of any controlled substance.

The court properly denied defendants' motion to suppress, since the administrative warrant was supported by probable cause and was not a mere pretext to gain entry into defendants' premises. Moreover, marijuana residue falls within the Controlled Substance Act's definition of marijuana, and Ronald DeLuca was in constructive possession of the residue found in his bedroom. For these reasons, and for the other reasons provided herein, defendants' judgments of sentence should be affirmed.

---

1. Both defendants filed timely notices of appeal on September 24, 2008, the 30th day after their judgments of sentence. On September 24, 2008, the court ordered Mario DeLuca to file a concise statement within 21 days. On October 10, 2008, Mario DeLuca filed a timely concise statement. On September 26, 2008, the court ordered Ronald DeLuca to file a concise statement within 21 days. Ronald DeLuca filed his concise statement 21 days later, on October 17, 2008.

# FACTUAL HISTORY

## I. *The Suppression Hearing*[2]

### A. The Warrants Relating to Defendants' Residence

The Commonwealth submitted two warrants into evidence during defendants' suppression hearing: an administrative warrant obtained on June 22, 2007 by Upper Darby Code Enforcement Officer Guy Buonadonna from a district justice and a search warrant obtained later that day by Officer Samuel Ziviello, an Upper Darby narcotics officer. Exhibits CS-1, CS-3. The court admitted both warrants without objection from the defendants. N.T., 4/16/08, pp. 13-14, 29-30.

The administrative warrant authorized the search of defendants' residence, a two-story house at 917 Brenton Road, Drexel Hill, Pennsylvania. Exhibit CS-1. Code Enforcement Officer Buonadonna averred as follows in an affidavit of probable cause appended to the warrant:

"On June 21, 2007, an anonymous complaint was taken from the Health Department by Cara Gavin. The complainant called concerned about the deplorable con-

---

2. Although the court did not enter findings of fact and conclusions of law at the conclusion of the suppression hearings, this opinion will facilitate appellate review by providing a detailed summary of the evidence credited by the court and lengthy analysis of the applicable law. *Commonwealth v. Stevenson,* 832 A.2d 1123, 1126 (Pa. Super. 2003) (citing *Commonwealth v. Reppert,* 814 A.2d 1196, 1200 (Pa. Super. 2002) (where trial court does not enter findings of fact and conclusions of law, appellate court may look at trial court's Rule 1925(a) opinion to garner findings of fact and conclusions of law).

dition of the property situated at 917 Brenton Road in Drexel Hill, PA 19026. The complainant stated that the property had trash around the entire property, and graffiti on the garage.

"Assistant Director of Property Maintenance, Guy Buonadonna and Code Enforcement Officer Kevin Colgan were on the scene and observed trash around the entire property, graffiti on the garage and graffiti on the ceiling of the top floor bedroom (observed from the rear common drive).[3]

"Officer Kevin Colgan retrieved the file for this dwelling and found a history of complainants addressing the violations they observed on 21 June 2007. This history goes as far back as July of 2003. Furthermore, the history also reveals the said owner, Mario DeLuca, was uncooperative and combative with code officials.

"At this time, I am requesting an administrative warrant to ensure the safety and well-being of the occupants of this property and its adjoining twin.

"This property was deemed unsuitable for human habitation in 2003, therefore I am concerned that the condition of this property has worsened." Exhibit CS-1.

The warrant alleged a violation of Upper Darby's Property Maintenance Code, Ordinance 2919. Exhibit

---

3. Defendants do not contend that the rear common drive was an unlawful vantage point from which to observe the interior of the house.

CS-1. The items to be seized were listed as "administrative purposes only." Exhibit CS-1.

On June 22, 2007, Code Enforcement Officer Buonadonna, accompanied by Upper Darby patrol officers, served the administrative warrant at 917 Brenton Road. N.T., 4/16/08, p. 18. When the patrol officers observed narcotics in the house, they contacted Officer Ziviello, who responded to the scene and personally observed the narcotics. N.T., 4/16/08, pp. 17-19.

Officer Ziviello has served for almost 10 years as a patrol officer and is now a narcotics officer. N.T., 4/16/08, pp. 15-16. Officer Ziviello testified that he assisted code enforcement officers execute administrative warrants on numerous occasions when he was a patrol officer. N.T., 4/16/08, p. 16. The police assist code enforcement officers to ensure their safety as well as the individuals upon whom warrants are served. N.T., 4/16/08, pp. 16, 18. It was standard procedure for the patrol unit to call in Officer Ziviello, since patrol units normally do not investigate narcotics cases. N.T., 4/16/08, p. 20. Officer Ziviello was not aware of any plan to obtain an administrative warrant to circumvent the need to establish probable cause for a regular search warrant. N.T., 4/16/08, p. 29.

Based on his observations of narcotics, Officer Ziviello obtained a search warrant to search defendants' residence at 917 Brenton Road for drugs and drug paraphernalia. Exhibit CS-3. Officer Ziviello stated in his affidavit of probable cause that Code Enforcement Officer Buonadonna conducted a property inspection due to complaints about the deplorable conditions of this residence. Exhibit CS-3. The affidavit continued:

"Ronald DeLuca allowed property maintenance officers inside the residence. Upon conducting their inspection, Mr. Buonadonna observed a burnt marijuana cigarette and rolling papers in plain view. The items were observed in a second floor bedroom. Police officers at the scene immediately secured the scene and notified the narcotics unit.

"Your affiant . . . observed the items and based upon my training and experience believed the items to be marijuana and drug paraphernalia." Exhibit CS-3.

A district justice approved the search warrant, which Officer Ziviello executed on the afternoon of June 22.

### B. The BOCA Property Maintenance Code and Upper Darby Ordinance 2919

The Commonwealth submitted into evidence a certified copy of Upper Darby Ordinance 2919, the ordinance referenced in the administrative warrant. This ordinance "regulate[s] the maintenance of all property, buildings and structures within Upper Darby Township to ensure that all structures are safe, sanitary, and fit for human occupation and use . . . ." Exhibit CS-2, p. 1. Section 1 of the ordinance adopts the Building Officials and Code Administrators (BOCA) National Property Maintenance Code, Fifth Edition, 1996, as Upper Darby Township's Real Property Maintenance Code for the maintenance and regulation of buildings and structures, together with all amendments prescribed in the ordinance. Exhibit CS-2, p. 1, section 1(a, b) (adopting "each and all of the regulations, provisions, penalties, conditions and terms of the [BOCA Code] . . . as if fully set forth in this ordi-

nance, together with all of the amendments prescribed by other sections of this ordinance").[4]

The BOCA Code is a lengthy[5] series of regulations that govern multiple property maintenance subjects, including light and ventilation, plumbing, mechanical and electrical issues and fire safety. A number of regulations require individuals to keep their homes in sanitary condition. Section 302.0 of the Code defines "garbage" as "animal and vegetable waste" and "rubbish" as "all combustible and noncombustible waste except garbage." Sections 306.2 and 306.3 require persons to dispose of rubbish and to dispose of garbage in a "reasonable" manner, respectively. Property interiors must be kept sanitary, while property exteriors must be clean and safe. BOCA Code, §§305.1, 303.1. Properties must also be kept free from insect and rat infestation. BOCA Code, §307.1.

The BOCA Code further provides that code enforcement officers shall have the right of entry into all properties for, inter alia, inspection and maintenance. BOCA Code, §105.4.

---

4. While the Commonwealth did not submit the BOCA Code into evidence, it was not required to do so. The court must take judicial notice of ordinances of municipal corporations, 42 Pa.C.S. §6107(a), and the court "may inform itself of such ordinances in such manner as it may deem proper and the tribunal may call upon counsel to aid it in obtaining such information." 42 Pa.C.S. §6107(b). Section 6107(b) gives the court discretion to obtain an ordinance on its own, to direct counsel to provide the ordinance, or to accept ordinances into evidence that counsel provides on his/her own initiative. In accordance with section 6107(b), the court supplemented its review of Ordinance 2919 with its independent review of the BOCA Code.

5. 41 1/2 pages, each page with long double columns.

Upper Darby Ordinance 2919 augments the BOCA Code with several amendments that are important to the court's analysis. Section 4 of the ordinance provides that the BOCA Code "shall be construed to secure its expressed intent, which is to ensure public health, safety and welfare insofar as they are affected by the continued occupancy and maintenance of structures and premises." Exhibit CS-2, p. 2.

Section 10 of the ordinance defines "code officials" as follows:

"The Department of Licenses and Inspection, Department of Public Health, the Department of Administrative Services and the Fire Department are hereby empowered to enforce the provisions of this Code and the directors of the Department of Licenses and Inspections and the Department of Public Health and the fire chief shall be known as the code officials. All references in this Code to any of those departments shall mean all of those departments. All references to the code official in this Code shall also apply to any person who any of the above referenced officials appoints as his designee." Exhibit CS-2, pp. 4-5.

Section 10 adds that code officials shall be appointed by the mayor of Upper Darby pursuant to a township administrative ordinance.

Section 11 of the ordinance provides that a code official "is authorized to enter the structure or premises at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. If entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law after consultation

with and upon the advice of the township solicitor." Exhibit CS-2, p. 5.

Finally, section 25 of the ordinance prescribes:

"A structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful, or because of the degree to which the structure is in disrepair or lacks maintenance, is unsanitary, vermin or rat-infested, contains filth and contamination, or lacks the ventilation, illumination, sanitary or heating facilities and/or other essential equipment required by this Code or any other township code or ordinance, or because the location of the structure constitutes a hazard to the occupant of the structure or to the public." Exhibit CS-2, p. 11.

## C. Ronald DeLuca's Testimony

Ronald DeLuca testified that the police used the administrative warrant as a pretext for searching his house for drugs, and that there was some conspiracy afoot to frame him for drug possession. Specifically, DeLuca testified that on the morning of June 22, officers at his doorstep "threw the warrant" at him when he opened the door. N.T., 4/16/08, p. 33. He shut the door, but the door "came flying open," knocking him to the ground. N.T., 4/16/08, p. 34. An officer immediately ran upstairs to Mario DeLuca's room and exclaimed: "I got it." N.T., 4/16/08, p. 34.

## D. The Court's Decision

The court found all of the Commonwealth's evidence relating to the searches relevant and credible.

The court did not find Ronald DeLuca's testimony credible. The court later commented with regard to his conspiracy theory: "I would personally think that no self-respecting co-conspirator would, if he were trying to frame people for criminal offenses, aim so low as to make it personal use [of] marijuana." N.T., 7/9/08, p. 14.

Accordingly, on April 17, 2008, the court entered an order denying defendants' motion to suppress on the grounds that "the administrative warrant was supported by probable cause, did not have as its purpose the seizure of property and was therefore not defective for failure to specify items to be searched for and seized, and was not merely a pretext for gaining access to premises situate at 917 Brenton Road in Upper Darby."

## II. *Evidence Adduced During Trial*

Code Enforcement Officer Buonadonna testified that on the morning of June 22, he served the administrative warrant at defendants' residence along with two other code enforcement officers and two Upper Darby police officers. N.T., 7/9/08, p. 19. While searching the house, Officer Buonadonna and the other officers observed what appeared to be marijuana in an upper bedroom. N.T., 7/9/08, p. 19. Officer Buonadonna stopped his search and called Captain Rhoades. N.T., 7/9/08, p. 20. Captain Rhoades and Officer Ziviello arrived in the early afternoon. N.T., 7/9/08, pp. 20-21.

Officer Ziviello testified that he proceeded to defendants' residence to verify what the patrol officers and property maintenance officers had seen. N.T., 7/9/08, p.

32. Captain Rhoades was also present at the house. N.T., 7/9/08, p. 81. Officer Buonadonna showed Officer Ziviello the rear upstairs bedroom and the exact position in the hallway where he observed the narcotics in the bedroom. N.T., 7/9/08, p. 34. Officer Ziviello also looked into another bedroom on the second floor in which there appeared to be narcotics and paraphernalia on an entertainment center. N.T., 7/9/08, p. 35. The doors to these rooms were open, so it was possible to look inside from the hallway. N.T., 7/9/08, p. 91. When the officer came downstairs, Mario DeLuca stated that he lived in the back bedroom, and Ronald DeLuca stated that he lived in the front bedroom. N.T., 7/9/08, p. 36.

Officer Ziviello went back to headquarters and obtained a criminal warrant to search defendants' residence for controlled substances and drug paraphernalia. Exhibit C-1 (search warrant); N.T., 7/9/08, pp. 36-37. The officer returned about one hour later to execute the warrant. N.T., 7/9/08, p. 38. In Mario DeLuca's bedroom, he recovered cigarette papers, one partially smoked marijuana cigarette, pills of various colors, and a clear sandwich bag with green leafy matter that the officer believed was marijuana. N.T., 7/9/08, pp. 38-39, 42, 66; see also, N.T., 7/9/08, pp. 88-89 (identifying Mario's bedroom as location where these items were found). On an entertainment center in Ronald DeLuca's bedroom, he recovered one tinfoil pipe containing residue, one clear sandwich bag with blunt residue, and a hearing notice for Upper Darby with Ronald DeLuca's name on it. N.T., 7/9/08, pp. 39-40, 89-91.

The parties stipulated to a lab report which stated that the substances in the sandwich bag and cigarette discov-

ered in Mario DeLuca's bedroom were .97 grams and .09 grams of marijuana, respectively. N.T., 7/9/08, pp. 43-44; exhibit C-8. The report further stated that the residue in the tinfoil pipe found in Ronald DeLuca's bedroom was marijuana. N.T., 7/9/08, pp. 43-44; exhibit C-8. The blunt residue found in Ronald DeLuca's bedroom was merely cigar residue. N.T., 7/9/08, pp. 89-90.

## DISCUSSION

### I. *The Court Properly Denied Defendants' Motions To Suppress*

#### A. Standard of Review

When a defendant files a motion to suppress, the Commonwealth bears the burden of production and persuasion to prove that it did not obtain the challenged evidence in violation of the defendant's rights. *Commonwealth v. West,* 834 A.2d 625, 629 (Pa. Super. 2003) (citing *Commonwealth v. Wilmington,* 729 A.2d 1160, 1163 (Pa. Super. 1999), *appeal denied,* 565 Pa. 644, 771 A.2d 1284 (2001)). The Commonwealth must prove by a preponderance of the evidence that the challenged evidence is admissible. *Commonwealth v. Smith,* 784 A.2d 182, 186 (Pa. Super. 2001) (citing *Commonwealth v. James,* 506 Pa. 526, 486 A.2d 376 (1985)).

In this case, a district justice issued an administrative search warrant and later a criminal search warrant for defendants' residence. The standards governing criminal search warrants are well-settled and are summarized in

the following paragraph. Administrative search warrants are subject to different standards which the court will discuss in detail on pages 319-323, *infra.*

The suppression court must assess the "totality of the circumstances" when determining whether probable cause exists for the issuance of a criminal search warrant. *Commonwealth v. Gray,* 509 Pa. 476, 485, 503 A.2d 921, 925 (1985). Specifically, the court must make a "practical, commonsense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gray, supra* at 484, 503 A.2d at 925 (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).[6] Mere probability of criminal activity is sufficient for probable cause; actual proof of criminal activity is not required. The information offered to demonstrate probable cause must be viewed in "a commonsense, nontechnical, ungrudging and positive manner." *Commonwealth v. Lloyd,* 948 A.2d 875, 880 (Pa. Super. 2008) (citing *Commonwealth v. Wilkinson,* 436 Pa. Super. 233, 238, 647 A.2d 583, 585-86 (1994)). The appellate court's duty is simply to ensure that the magistrate had a "substantial basis for concluding that probable cause exist[s]." *Lloyd, supra* (citing *Wilkinson, supra*). The appellate court must limit its inquiry to the information within the four corners of the affidavit sub-

---

6. It appears that paragraph 14 of Ronald DeLuca's motion to suppress recites the old *Aguilar-Spinelli* standards that the United States Supreme Court jettisoned in *Gates* and the Pennsylvania Supreme Court discarded in *Gray.*

mitted in support of probable cause when determining whether the warrant was issued upon probable cause. *Lloyd, supra* (citing *Wilkinson, supra,* 436 Pa. Super. at 238, 647 A.2d at 586).

When an appellate court reviews an order denying a motion to suppress evidence, it is limited to determining whether the evidence of record supports the factual findings, inferences and legal conclusions of the suppression court. *Commonwealth v. Bennett,* 827 A.2d 469, 475 (Pa. Super. 2003). In so doing, the appellate court considers only the evidence of the prosecution along with defense evidence that, fairly read in the context of the entire record, remains uncontradicted. *Commonwealth v. Fitzpatrick,* 446 Pa. Super. 87, 91, 666 A.2d 323, 325 (1995). Questions of credibility and the weight to be accorded to witness testimony are issues within the sound discretion of the trial court. *Id.* If the record supports the factual findings of the trial court, the appellate court may reverse only for an error of law. *Id.* Moreover, a trial court's determination of probable cause is accorded the utmost deference on appeal. *Commonwealth v. Taylor,* 850 A.2d 684, 687 (Pa. Super. 2004).

B. The Four Corners of the Administrative Warrant Provided Probable Cause for an Administrative Search

The lone issue raised by Mario DeLuca on appeal is as follows:

"The factual averments in the 'affidavit of probable cause' submitted with the application for the administrative warrant were not sufficient to justify the issuance of that warrant and did not justify the subsequent entry into

the house by employees of the Upper Darby Health Department or the police. As such, the information obtained by them after gaining entry into the premises was procured illegally and could not justify the subsequent issuance of a search warrant for the premises." Mario DeLuca's concise statement, ¶1.

Ronald DeLuca also claims that the four corners of the administrative warrant did not provide probable cause for the administrative search. Ronald DeLuca's Concise Statement, ¶1(b).[7] The court disagrees.

"There are two types of search warrants: (1) a general search warrant, which allows law enforcement officials to search for the fruits or instrumentalities of a crime, is issued by a court and is attendant to suspected criminal activity; and (2) an administrative search warrant, which allows a municipal official [to inspect] premises to ensure compliance with various municipal codes, *i.e.,* construction codes, fire codes. *Camara, [infra].* These administrative warrants 'may but do not necessarily have to be issued by courts . . . .'" *Commonwealth v. Tobin,* 828 A.2d 415, 419 (Pa. Commw. 2003) (citing *Griffin v. Wisconsin,* 483 U.S. 868, 877, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). Administrative warrants may be issued by neutral magistrates or neutral officers. *Id.*

The issuance of an administrative warrant authorizing municipal health and safety inspectors to enter and inspect a particular dwelling is not confined to cases in

7. The court will re-order the issues raised in Ronald DeLuca's statement of matters complained of on appeal for purposes of convenience.

which the inspector has probable cause to believe that the particular dwelling contains code violations. *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Instead, probable cause to issue an administrative warrant exists "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (*e.g.,* a multifamily apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Id.,* 387 U.S. at 538.

In evaluating the various factors, reasonableness is the ultimate standard, and it is assessed by balancing the need to search against the level of invasion the search entails. *Tobin,* 828 A.2d at 420.

The Commonwealth Court cites *Camara* with approval in *Tobin,* observing:

"*Camara* . . . decide[d] that a municipal inspector, in order to obtain a warrant, did *not* need to show probable cause to believe that the dwelling contained violations of the minimum code standards. *[Camara]* focused on the nature of the governmental interest, which it found was the prevention of any unintentional development of conditions that would be hazardous to public health or safety, such as fires or epidemics, as well as blighted conditions that adversely affect economic values." *Id.,* 828 A.2d at 423. (emphasis in original)

Importantly, *Tobin* notes that an administrative search warrant does not require as high a level of probable cause as a criminal search warrant. The *Tobin* court wrote:

"*[Camara]* reasoned that, because an agency's decision to conduct an area inspection is based on conditions in the area as a whole, the 'criminal' probable cause standard asserted by the appellant was unworkable and would result in area inspections being eliminated, dealing a 'crushing blow' to the goals of code enforcement. Relying on the long history of judicial and public acceptance of inspection programs, the public interest in preventing and abating dangerous conditions, and the impersonal nature of the search, which does not seek to 'discover a crime,' it held, as we noted earlier in this opinion, that probable cause to issue an administrative search warrant exists if 'reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling.' *Id.* at 538, 87 S.Ct. 1727. We, too, must determine 'probable cause' within this context." *Id.* at 423.[8]

---

8. The Superior Court, which will decide the present appeals, is not bound to follow Commonwealth Court decisions such as *Tobin. McCray v. Pennsylvania Department of Corrections,* 582 Pa. 440, 445 n.12, 872 A.2d 1127, 1130 n.12 (2005) (citing *Commonwealth v. McDermott,* 377 Pa. Super. 623, 633, 547 A.2d 1236, 1240 (1988)). Nevertheless, *Tobin* should be persuasive because of its incisive reasoning and because it is consistent with the opinions of other courts.

For example, *Tobin* is fully consistent with the scholarly analysis in *Smith v. Borough of Glenolden,* 1994 WL 672618 (E.D. Pa. 1994):

"*Camara* sought to resolve the tension between the rigid text of the Fourth Amendment and the difficulties of preventing the deterioration of urban housing. *Id.,* [387 U.S.] at 525. The text of the Fourth Amendment surely would govern the 'right of officers to thrust themselves into a home.' *Id.* at 529 (quoting *Johnson v. United States,* 333 U.S.

Guided by these standards, the court concludes that the four corners of the administrative warrant furnished probable cause to search defendants' residence. First, the BOCA Code and the amendments thereto in Upper Darby Ordinance 2919 are "reasonable legislative or

---

10, 13 (1948)). Moreover, unannounced, warrantless inspections would violate the 'one governing principle . . . consistently . . . followed' in Fourth Amendment cases:

"[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.

"*Id.* at 528-29 (citing cases). Yet the Supreme Court in *Camara* also recognized the 'intensive efforts at all levels of government to contain and eliminate urban blight' through the periodic, mandatory inspection of private property. *Id.* at 525. If these inspections could only take place upon the belief that a violation of a housing code had already occurred or was imminent, then the purpose of the inspection—*avoiding* the violations—would be thwarted. *Id.* at 535-36. The court credited the substantial agreement among scholars that 'the only effective way to seek universal compliance with the minimum standards required by municipal codes is through routine periodic inspections of all structures.' *Id.*

"*Camara* resolved this textual and practical tension by remaining faithful to the Fourth Amendment's prohibition of warrantless searches of dwellings yet altering the definition of 'probable cause' to accommodate the need for housing inspections. First, the court held that such inspections 'when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual' and are therefore invalid. *Id.* at 534. Thus, after *Camara,* a state must obtain a warrant to inspect private property if the occupant does not consent to the search. Second, *Camara* altered the definition of 'probable cause' in the context of routine noncriminal housing inspections conducted pursuant to a regulatory scheme. The court held that ' "probable cause" to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling.' *Id.* at 538. Thus, in housing inspections and other administrative searches, probable cause is met by finding a reasonable relationship between the 'legislative or administrative standards' (here,

administrative standards." *Camara, supra,* 387 U.S. at 538. This legislation protects public health by requiring homeowners to meet minimal sanitation standards, such as disposing of garbage and rubbish, keeping their properties clean, and preventing infestations of rats and insects. To ensure compliance with these regulations, the BOCA Code and Ordinance 2919 authorize code enforcement officials to enter residences at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. Individuals should satisfy these undemanding standards in return for the privilege of living in organized society.

Moreover, the administrative warrant articulates a reasonable relationship between the local ordinances and

-----

the Borough Code) and the dwelling to be searched (here, Smith's apartment).

"The court arrived at its definition of 'probable cause' by 'balancing the need to search against the invasion which the search entails.' *Id.* at 536-37. The court identified three reasons that justified diminished protection for housing inspections: (1) the long history of judicial and legislative acceptance of housing inspection programs; (2) the public interest in preventing and abating dangerous conditions that may not be apparent without a close inspection of the residence (*e.g.,* faulty wiring); and (3) the impersonal nature of the investigation. *Id.*" *Id.* at *2-3 (footnotes omitted); see also, *State v. Carter,* 733 N.W.2d 333, 337 (Iowa 2007) (citing *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)) ("An administrative search warrant does not require the probable cause necessary for a criminal warrant"); *Florida Dept. of Agriculture and Consumer Services v. Haire,* 836 So.2d 1040, 1058 (Fl. App. 4 Dist. 2003) ("relaxed" probable cause evaluation in administrative search situations); *People v. Weems,* 2004 WL 2526429, *3 (Cal. App. 2 Dist. 2004) ("a lesser showing of cause is needed to obtain an administrative warrant than in the case of a criminal search warrant, and is a less hostile intrusion than the search for the fruits and instrumentalities of the crime").

the location of the search, defendants' residence. The affidavit of probable cause alleges that on June 21, 2007, while investigating an anonymous complaint about the condition of defendants' residence, Code Enforcement Officer Buonadonna observed trash around the entire property, graffiti on the garage and graffiti on the ceiling of the top floor bedroom. Exhibit CS-1. The file for defendants' property revealed that the property had been deemed unsuitable for human habitation in 2003, and that there had been complaints about the condition of the property during the next four years. Exhibit CS-1. Under these circumstances, Officer Buonadonna had ample justification for expressing "concern[] that the condition of this property has worsened," *id.,* and requesting leave to inspect the interior of the premises. Stated in terms of the relevant ordinance, a reasonable code official would infer from the squalid conditions around the outside of the house that the inside was "unsanitary, vermin or rat-infested, [or] contain[ed] filth and contamination." Upper Darby Ordinance 2919, section 25. *Camara, supra,* 387 U.S. at 538 (nature of building and condition of entire area can give rise to probable cause for administrative search). Moreover, the need to inspect the residence far outweighed the negligible invasion of the defendants' privacy caused by the inspection. *Tobin,* 828 A.2d at 420 (reasonableness of administrative search is assessed by balancing need to search against level of invasion the search entails).

Therefore, the court rejects defendants' argument that the four corners of the administrative warrant did not provide probable cause to inspect defendants' residence.

This decision resolves another issue in Ronald De-Luca's concise statement, to wit, his contention that the court "erred in finding that the administrative search should have been held to a higher standard of probable cause." Ronald DeLuca's concise statement, ¶1(a). Presumably, he meant to say that the court erred in finding that the administrative search should *not* have been held to a higher standard of probable cause. In any event, *Camara* and its progeny, see footnote 8, *supra,* clearly hold that administrative search warrants do not require as high a level of probable cause as criminal search warrants.

### C. The Code Officials Had Probable Cause To Enter Defendants' Home To Perform an Administrative Search

Ronald DeLuca argues that "the trial court erred in finding that . . . there was probable cause that would allow for the code officials to enter the home." Ronald DeLuca's concise statement, ¶1(d). The court disagrees.

The court has already held above that the four corners of the warrant provided probable cause for an administrative search. In addition, during the suppression hearing, the Commonwealth fulfilled its burden of proving that the evidence found during the administrative search was admissible. The court admitted the administrative warrant into evidence without objection. In its role as fact-finder, the court was free to believe (and did believe) all averments in the warrant. *Commonwealth v. Elmobdy,* 823 A.2d 180, 183 (Pa. Super. 2003) (citing *Commonwealth*

*v. Griffin,* 785 A.2d 501, 505 (Pa. Super. 2001) ("the suppression court is free to believe all, some or none of the evidence presented at the suppression hearing."). Conversely, the court did not believe any of Ronald DeLuca's testimony concerning the alleged pretextual nature of the search. Given these factual findings, the evidence demonstrated probable cause for the administrative search.

In a similar vein, Ronald DeLuca argues that the court "erred in not relying upon or not finding [his] testimony credible at the suppression hearing[,] as he was the only one to testify that was present at the time the administrative search warrant was allegedly executed." Ronald DeLuca's concise statement, ¶1(j). The court has discretion to believe or disbelieve the testimony of any witness. *Elmobdy, supra,* 823 A.2d at 183 (citing *Griffin, supra,* 785 A.2d at 505) ("It is within the suppression court's sole province as fact-finder to pass on the credibility of witnesses and the weight to be given to their testimony."). The court commented that DeLuca's credibility "is significantly impacted by the contrary documentary evidence [the administrative and criminal search warrants] that's been admitted without objection." N.T., 4/16/08, p. 39. It was well within the court's discretion to credit the Commonwealth's evidence and disregard DeLuca's testimony. *Elmobdy.*

### D. The Administrative Warrant Did Not Violate the Rules of Criminal Procedure

Ronald DeLuca asserts that the administrative warrant violated Pa.R.Crim.P. 205 and 206 because it failed to identify the items or property to be seized or the

purpose for entering defendants' home. Ronald De-Luca's concise statement, ¶1(e). These rules only apply to *search* warrants, not to the *administrative* warrant in issue.

A search warrant allows law enforcement officials to search for the fruits or instrumentalities of a crime. See Pa.R.Crim.P. 201 ("a search warrant may be issued to search for and to seize (1) contraband, the fruits of a crime, or things otherwise criminally possessed; or (2) property that is or has been used as the means of committing a criminal offense; or (3) property that constitutes evidence of the commission of a criminal offense"). Rule 205 requires a *search* warrant to specify, inter alia, the property to be seized. Rule 206 requires the *search* warrant to include an affidavit that identifies, inter alia, (1) the "items or property to be searched for and seized," (2) the "crime which has been or is being committed," and (3) describes the "facts and circumstances which form the basis for the affiant's conclusion that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband," and that these items "are or are expected to be located on the particular person or at the particular place searched."

Unlike search warrants, administrative warrants are not intended for seizure of criminal evidence but merely for inspection of homes or businesses to ensure compliance with health and safety codes. *Tobin, supra,* 828 A.2d at 419. Rules 205's and 206's requirements to identify "property to be seized" have no place in an administrative warrant, since the applicant does not intend to seize anything. Therefore, DeLuca's claim that the administra-

tive warrant "failed to identify the items to be seized" fails.

The court also rejects DeLuca's argument that the administrative warrant failed to identify the purpose for entering his home. Code Officer Buonadonna averred in his affidavit of probable cause that he received an anonymous complaint about the condition of the property, and that he personally observed trash around the entire property and graffiti on the garage and on the ceiling of the top floor bedroom. Exhibit CS-1. He further stated that there were four years of complaints about this house. Accordingly, he "request[ed] an administrative warrant to ensure the safety and well-being of the occupants of this property and its adjoining twin." The warrant also cited Upper Darby Ordinance 2919, the local ordinance which permits code enforcement officials to conduct administrative searches. These statements clearly identify the purpose of the warrant as facilitating an inspection of the residence to ensure its compliance with local health and safety ordinances.

### E. The Administrative Warrant Was Not a Pretext for Gaining Entry Into Defendants' Residence

Ronald DeLuca contends that the administrative warrant was "simply a pretext for gaining access to the premises at 917 Brenton Road in Upper Darby." Ronald DeLuca concise statement, ¶1(f). According to his attorney, the police "didn't have any other evidence enough to get a general search warrant, so they had an administrative warrant requested that gave them the access to

get in the home to look for what they were looking for, which was drugs." The court finds this argument speculative and completely unsupported by the evidence.

It is true that "[t]he police cannot conduct a warrantless administrative search to advance a criminal investigation under the pretext of addressing a specific, compelling governmental interest advanced by a statutory scheme." *Commonwealth v. Petroll,* 558 Pa. 565, 738 A.2d 993, 1003-1004 (1999). The purpose of this rule is to prevent administrative searches from becoming "pretexts for crime control." *United States v. Knight,* 306 F.3d 534, 537 (8th Cir. 2002).

On the other hand, "the discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." *New York v. Burger,* 482 U.S. 691, 716, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). A regulatory statute "may have the effect of deterring criminal activity and still not conflict with either state or federal warrant requirements. The line between administrative regulation and criminal deterrence is easily blurred, and we will not find an administrative statute unconstitutional merely because it has the 'same ultimate purpose as penal laws.'" *Petroll, supra,* 738 A.2d at 1004 (citing *Burger,* 482 U.S. at 713-16, 107 S.Ct. at 2649-51).

At the outset, it is questionable whether *Petroll's* pretext doctrine applies when, as here, government officials obtain a warrant to perform an administrative search. *Petroll* cautions that *warrantless* administrative searches cannot be pretextual; it does not address whether a

search can be pretextual when government officials obtain a warrant from a neutral and impartial magistrate.

The court need not delve into this academic issue, however, because it is obvious that the administrative warrant for defendants' residence was not pretextual. This was nothing more than an administrative search during which government officials stumbled upon evidence of crime in plain view. The affidavit in the warrant provided probable cause to search the interior of defendants' residence to find whether it was "unsanitary, vermin or rat-infested, [or] contain[ed] filth and contamination." Upper Darby Ordinance 2919. There was no evidence that any averment in the administrative warrant was false. Nor was there credible evidence of any plot to obtain an administrative warrant in order to circumvent the more stringent criminal warrant requirements. The court found truthful Officer Ziviello's testimony that he did not know of such a plot, N.T., 4/16/08, pp. 28-29, and the court discredited Ronald DeLuca's testimony that the police barged into his house to search for drugs. N.T., 4/16/08, pp. 32-34. As the court suggested during trial, if there was any conspiracy to use an administrative warrant as a pretext for searching for drugs, the police would have done much more than merely find a few grams of marijuana.

The court does not infer the presence of a conspiracy from the fact that Upper Darby patrol officers accompanied code enforcement officials during the administrative search. Officer Ziviello testified credibly that patrol officers routinely accompany code enforcement officials in administrative searches to ensure their safety. This policy is quite logical, as at least one other court has

recognized. *Dawson v. City of Seattle,* 435 F.3d 1054, 1066-67 (9th Cir. 2006) (holding that it was constitutionally permissible for police officers to accompany health inspectors during their search of boardinghouse for rodent infestation and to detain tenants during search; detentions were justified to secure the safety of inspecting health officials and police officers). Stated another way, collaboration between code enforcement officials and police officers is not enough to invalidate an administrative search. There must be evidence that the actors used the administrative search to help police evade the usual warrant requirements.[9] Here, there was none.

### F. There Was Probable Cause for a Search Warrant

The court disagrees with Ronald DeLuca's argument that probable cause did not exist to issue the general search warrant. Ronald DeLuca concise statement, ¶1(g). The code officers and Upper Darby patrol officers had probable cause of code violations and had the right to

---

9. Cf. *United States v. Reyes,* 283 F.3d 446, 463 (2d Cir. 2002) ("A probation officer acts as a stalking horse if he conducts a probation search on prior request of, and in concert with, law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer"); *United States v. McFarland,* 116 F.3d 316, 318 (8th Cir.1997) ("a parole search is unlawful when it is nothing more than a ruse for a police investigation," but "parole and police officers may work together . . . provided the parole officer is pursuing parole-related objectives").

enter DeLuca's house to execute the administrative warrant. While inside, Code Enforcement Officer Buonadonna observed marijuana and rolling papers in plain view in a second floor bedroom. It was immediately apparent that the objects were incriminating, so the patrol officers with Officer Buonadonna notified Officer Ziviello, who came to the house and observed the objects himself. Officer Ziviello applied for a general warrant to search defendants' residence for drugs and paraphernalia, and he executed the warrant following magisterial approval. Exhibit CS-3; N.T., 4/16/08, pp. 17-19. The court admitted Officer Ziviello's warrant into evidence without objection and found the averments in the warrant credible. Exhibit CS-3. The court also credited Officer Ziviello's testimony about his inspection of the drugs and paraphernalia before applying for the warrant.

Probable cause clearly existed for the general search warrant, since Code Enforcement Officer Buonadonna and Officer Ziviello observed evidence of crime in plain view while lawfully inside DeLuca's house. *Commonwealth v. Collins,* 950 A.2d 1041, 1045 n.4 (Pa. Super. 2008) (citing *Commonwealth v. McCree,* 592 Pa. 238, 249-51, 924 A.2d 621, 628-29 (2007)) (plain view doctrine permits warrantless seizure of object in plain view when: (1) officer views object from lawful vantage point; (2) it is immediately apparent to him that object is incriminating; and (3) officer has lawful right of access to object). In the words of *Gray* and *Gates,* the warrant created a "fair probability that contraband or evidence of a crime will be found in a particular place," namely defendants' residence. *Gray, supra,* 509 Pa. at 484, 503 A.2d at 925; *Gates, supra,* 462 U.S. at 238.

DeLuca insists that "the probable cause used to obtain the administrative search warrant was clearly insufficient to exact the issuance of a general search warrant." Ronald DeLuca concise statement, ¶1(g). While it is true that a higher level of probable cause is necessary for general search warrants than for administrative warrants, *Tobin, supra,* Officer Ziviello's general search warrant easily satisfied the higher standard for the reasons given above, viz., the observation of criminal evidence in plain view inside DeLuca's house.

Lastly, even if the general search warrant was defective—which it was not—the plain view doctrine permitted seizure of the drugs and paraphernalia without a warrant. This doctrine authorizes warrantless seizure of criminal evidence "when the officers' 'view' of contraband or some illegal object occurs *after* they have first entered a constitutionally protected space and the intrusion was justified by consent, hot pursuit or a warrant. See *Commonwealth v. English,* 839 A.2d 1136, 1140 (Pa. Super. 2003); *Commonwealth v. Weik,* 360 Pa. Super. 560, 564, 521 A.2d 44, 46 (1987). Because the constitutional imperative of probable cause has been satisfied before an impartial magistrate or a clear exception has been shown, officers on the scene may seize the item they observed without further recourse to the warrant process. See *English,* 839 A.2d at 1140; *Weik,* 360 Pa. Super. at 565, 521 A.2d at 46." *Commonwealth v. Newton,* 943 A.2d 278, 282 (Pa. Super. 2007).

The code officers and police officers were entitled to enter all rooms in defendants' house pursuant to the administrative warrant. Consequently, upon observing the marijuana and paraphernalia, they were entitled to

seize these items without first applying for a warrant. *Id.* It therefore seems superfluous for DeLuca to quarrel about the contents of the general search warrant.

### G. The General Search Warrant Complied With the Rules of Criminal Procedure

Ronald DeLuca complains that the "trial court erred in finding that the general search warrant was in compliance with the [Pennsylvania Rules of Criminal Procedure]." Ronald DeLuca concise statement, ¶1(h).

DeLuca waived this issue by failing to include it in his February 15, 2008 or April 14, 2008 motions to suppress. Pennsylvania Rule of Criminal Procedure 581(D) prescribes: "The motion [to suppress] shall state specifically and with particularity the evidence sought to be suppressed, *the grounds for suppression,* and the facts and events in support thereof." (emphasis added) Failure to raise an issue in a suppression motion or during the suppression hearing will result in waiver. *Commonwealth v. Whiting,* 767 A.2d 1083, 1087 (Pa. Super. 2001), *appeal denied,* 568 Pa. 699, 796 A.2d 982 (2001) (defendant waived objection to search of his car by failing to raise this issue in suppression motion or mention this issue verbally during suppression hearing).

DeLuca's February 14, 2008 motion to suppress contended that the *administrative* warrant ran afoul of the Rules of Criminal Procedure but did not make the same argument concerning the general search warrant. Paragraphs 1-6 of this motion allege facts; paragraphs 7-11 claim that the administrative warrant violated Pa.R.Crim.P. 203, 205 and 206; paragraphs 12-17 assert violations of

his constitutional rights. Similarly, the April 14, 2008 motion to suppress focuses on the administrative warrant with occasional references to general warrant standards, but nowhere does it allege how the general warrant violated the Rules of Criminal Procedure. In addition, defense counsel argued during the suppression hearing that the administrative warrant violated the Rules of Criminal Procedure but said nothing about how the general warrant violated the rules. N.T., 4/16/08, pp. 5-8, 41-43. Therefore, DeLuca waived this issue.

DeLuca has also waived this issue because his concise statement fails to specify the rule(s) of procedure that the general warrant violated. "When [the trial court] has to guess what issues an appellant is appealing [in his concise statement of matters on appeal], that is not enough for meaningful review." *Commonwealth v. Dowling,* 778 A.2d 683, 686 (Pa. Super. 2001). "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." *In re Estate of Daubert,* 757 A.2d 962, 963 (Pa. Super. 2000). "In other words, a concise statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no concise statement at all." *Dowling,* 778 A.2d at 686-87. Here, Rules 205 and 206, which govern the contents of search warrants and the contents of search warrant applications, respectively, both contain eight detailed subparagraphs. DeLuca's concise statement, however, fails to articulate which subparagraphs have been transgressed. This might be forgivable if defense counsel had not participated in pretrial and trial proceed-

ings. *Commonwealth v. McCurdy*, 943 A.2d 299, 301 (Pa. Super. 2008) (defendant did not waive on appeal his argument that his convictions for corrupt organizations and conspiracy to commit corrupt organizations were not supported by sufficient evidence, due to vagueness of statement of errors complained of on appeal filed by defense counsel, as counsel's statement was necessarily vague, given that counsel, who had been appointed following withdrawal of defendant's prior counsel, had not participated in trial and had not yet had opportunity to review that proceeding). But in this case, defense counsel participated throughout the case and therefore had ample opportunity to make a specific objection.

Even if DeLuca somehow preserved this issue for appeal, it is devoid of merit, since the general warrant set forth all matters required under Rules 205 and 206 with particularity.

## H. The Commonwealth Met Its Burden of Proof With Regard to Defendants' Motion To Suppress

Finally, Ronald DeLuca asserts that the Commonwealth failed to meet its burden of proof at the suppression hearing. Ronald DeLuca concise statement, ¶1(h). Based on the foregoing discussion, the court has no trouble concluding that the Commonwealth met its burden. The court properly denied the motion.

## II. *The Evidence Was Sufficient To Support Ronald DeLuca's Conviction for Possession of a Small Amount of Marijuana*

Ronald DeLuca maintains that the court erred in "finding that constructive possession of marijuana residue was

enough to find [him] guilty of possession of [a] small amount of marijuana." Ronald DeLuca concise statement, ¶2. He further contends that the court erred "in finding that [he] constructively possessed a small amount of marijuana." Ronald DeLuca concise statement, ¶3. The court will address these issues together.

When reviewing a challenge to the sufficiency of the evidence, Pennsylvania appellate courts must view all the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, the verdict winner. *Commonwealth v. Widmer,* 560 Pa. 308, 319, 744 A.2d 745, 751 (2000). The evidence is sufficient to support the verdict when it establishes each material element of the crime charged against the defendant beyond a reasonable doubt. *Id.*

The Controlled Substance, Drug, Device and Cosmetic Act prohibits, inter alia, "the possession of a small amount of marijuana only for personal use." 35 P.S. §780-113(a)(31)(i). The Act defines marijuana as follows: "consists of all forms, species and/or varieties of the genus Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; *and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin;* but shall not include tetrahydrocannabinols, the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, cake, or the sterilized seed of such plant which is incapable of germination." 35 P.S. §780-102. (emphasis added)

Here, the police recovered one tinfoil pipe with marijuana residue in Ronald DeLuca's bedroom. DeLuca insists that marijuana *residue* falls outside the Act's definition of marijuana.

Penal statutes such as the Act must be strictly construed. 1 Pa.C.S. §1928(b)(1). Nevertheless, "[t]he need for strict construction does not require that the words of a penal statute be given their narrowest possible meaning or that legislative intent be disregarded . . . nor does it override the more general principle that the words of a statute must be construed according to their common and approved usage. . . . It does mean, however, that where ambiguity exists in the language of a penal statute, such language should be interpreted in the light most favorable to the accused. . . . More specifically, where doubt exists concerning the proper scope of a penal statute, it is the accused who should receive the benefit of such doubt. . . . Significantly, a court may not achieve an acceptable construction of a penal statute by reading into the statute terms that broaden its scope." *Commonwealth v. Booth,* 564 Pa. 228, 234, 766 A.2d 843, 846 (2001). (citations omitted)

Since the court cannot locate any decision that squarely addresses this question,[10] it will construe the Act's

---

10. The closest case is *Commonwealth v. Wisor,* 231 Pa. Super. 339, 331 A.2d 861 (1974), in which the police found a corncob pipe containing marijuana residue in a crevice in the front seat of the defendant's car. The issue in *Wisor* was whether the defendant was in constructive possession of the pipe. The Superior Court held that he was in constructive possession because he had the power of control over the pipe and could have exercised dominion over it. There was no dispute over whether the residue constituted marijuana.

terms "according to their common and approved usage." *Booth, supra.* The dictionary defines "derivative" as "a substance or compound obtained from, or regarded as derived from, another substance or compound." Random House Dictionary of the English Language, second edition (unabridged) (Random House Inc. 1987). Marijuana residue is a "derivative" under this definition as a "substance . . . obtained from, or regarded as derived from," the marijuana plant, seeds or resin smoked in the pipe.

Another issue is whether DeLuca possessed the marijuana residue "for personal use," as required under 35 P.S. §780-113(a)(31)(i). The court finds that he did, since the presence of residue in the pipe demonstrates that he smoked it by lighting it with some form of flame.

The final issue is whether DeLuca was in constructive possession of the pipe found in his bedroom. The Superior Court recently observed:

" 'When contraband is not found on the defendant's person, the Commonwealth must establish constructive possession . . . .' *Commonwealth v. Haskins,* 450 Pa. Super. 540, [544,] 677 A.2d 328, 330 (1996), *appeal denied,* 547 Pa. 751, 692 A.2d 563 (1997). 'Constructive possession is the ability to exercise conscious control or dominion over the illegal substance and the intent to exercise that control.' *Commonwealth v. Kirkland,* 831 A.2d 607, 610 (Pa. Super. 2003), *appeal denied,* 577 Pa. 712, 847 A.2d 1280 (2004) (citing *Commonwealth v. Macolino,* 503 Pa. 201, 469 A.2d 132 (1983)). '[T]wo actors may have joint control and equal access and thus

both may constructively possess the contraband.' *Haskins, supra* at 330. 'The intent to exercise conscious dominion can be inferred from the totality of the circumstances.' *Kirkland, supra* at 610." *Commonwealth v, Jones,* 874 A.2d 108, 121 (Pa. Super. 2005).

Mere presence at the scene, however, is insufficient to prove constructive possession of contraband. *Commonwealth v. Sanes,* 955 A.2d 369, 374 (Pa. Super. 2008) (citing *Commonwealth v. Valette,* 531 Pa. 384, 390-91, 613 A.2d 548, 551 (1992); *Commonwealth v. Keblitis,* 500 Pa. 321, 324, 456 A.2d 149, 151 (1983)).

Construed in the light most favorable to the Commonwealth, the evidence establishes that Ronald DeLuca was in constructive possession of the marijuana. The police found the pipe containing marijuana in the front bedroom in plain view along with a hearing notice addressed to Ronald DeLuca. Officer Ziviello heard Ronald DeLuca state that he lived in that bedroom. These facts demonstrate more than mere presence at the scene. They show that DeLuca had the ability to exercise conscious control or dominion over the pipe and the intent to exercise that control. *Commonwealth v. Minoske,* 295 Pa. Super. 192, 198, 441 A.2d 414, 417-18 (1982) (where contraband is found among defendant's personal effects in his bedroom, a place normally accessible only to the defendant, jury can properly infer that he had both the power and intent to control the contraband and therefore had constructive possession of contraband); *Commonwealth v. Bruner,* 388 Pa. Super. 82, 98, 564 A.2d 1277, 1285 (1989) (evidence was sufficient to establish defendant's constructive possession of heroin and marijuana found in first floor apartment in building owned by defendant;

envelopes addressed to defendant and traffic citation made out to defendant were found in apartment and witness testified that defendant lived in that residence and that he had met with defendant there on several occasions); cf. *Commonwealth v. Mudrick,* 510 Pa. 305, 307, 507 A.2d 1212, 1213-14 (1986) (constructive possession established where defendant kept his personal belongings in residence where drugs were found in plain view and slept in bedroom where other drugs were found).

While counsel might theorize that the residue belonged to Mario DeLuca, who lived in the other second floor bedroom, this argument runs afoul of the standard compelling construction of the evidence in the light most favorable to the Commonwealth.[11] *Sanes, supra,* 955 A.2d at 373 (where defendant resided in apartment and police found his clothing in the bedroom where they found firearms, evidence was sufficient to demonstrate that he exercised conscious dominion over firearms and intent to exercise control; "[w]hile appellant theorizes that perhaps his father, visiting from overseas, owned the .38 special and jacket . . . there was no evidence of that at trial, and such an argument misconstrues our standard of review.").

## CONCLUSION

For the foregoing reasons, the court respectfully submits that the judgments of sentence against Mario DeLuca and Ronald DeLuca should be affirmed.

---

11. Even if Mario DeLuca had access to the pipe, two or more individuals (Ronald and Mario) can jointly possess the same contraband. *Jones, supra.*